UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| UNITED STATES OF AMERICA, | \* CR No. 21-50089 |
| Plaintiff, | \* |
| | \* SENTENCING HEARING |
| vs. | \* |
| | \* AUGUST 16, 2022 |
| JAVIER CLARK MORENO, | \* |
| Defendant. | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PUBLIC TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE JEFFREY L. VIKEN,

U.S. DISTRICT COURT JUDGE

**(PURSUANT TO CRIMINAL LOCAL RULE 57.10, PORTIONS OF ALL**

**CHANGE OF PLEA AND SENTENCING TRANSCRIPTS ARE RESTRICTED)**

APPEARANCES:

FOR THE PLAINTIFF:  SARAH B. COLLINS
                        U.S. ATTORNEY'S OFFICE
                        515 Ninth Street, #201
                        Rapid City, SD, 57701
                        (605) 342-7822
                        sarah.b.collins@usdoj.gov

FOR THE DEFENDANT:  PAUL J. ANDREWS
                        ANDREWS LAW OFFICE LLC
                        14 St. Joseph St. #200D
                        Rapid City, SD, 57701
                        605-718-4001

COURT REPORTER:     SHERI L. NOT HELP HIM, RPR, CRR
                        Official Court Reporter
                        550 Ninth Street, #302
                        Rapid City, South Dakota 57701
                        Phone: (605) 399-6007.
                        Sheri_Nothelphim@sdd.uscourts.gov

```
 1              PROCEEDINGS ~ August 16, 2022
 2            Before Hon. JEFFREY L. VIKEN, Judge
 3
 4         (Proceedings in open court at 1:42 p.m.)
 5         THE COURT:  This is the time set for sentencing
 6  in the case of United States versus Javier Clark Moreno,
 7  our file 21-50084.
 8              May I have the appearance of government counsel,
 9  please?
10         MS. COLLINS:  Sarah Collins on behalf of the
11  United States.
12         THE COURT:  Afternoon, Ms. Collins.
13         Defense?
14         MR. ANDREWS:  Afternoon, Your Honor.  Paul
15  Andrews here on behalf of Mr. Moreno.
16         THE COURT:  Good afternoon, Mr. Moreno.
17         THE DEFENDANT:  Yep.
18         THE COURT:  We have Ms. Breanna Rhodes with us
19  from United States Probation.  Ms. Rhodes prepared your
20  presentence investigation report.
21              Mr. Moreno, have you had enough time to work
22  with Mr. Andrews to prepare for sentencing?
23         THE DEFENDANT:  Yes.
24         THE COURT:  As we go along here, and if you have
25  questions and wish to speak to your attorney, would you
```

1  let me know that, please?

2        THE DEFENDANT:  I will.

3        THE COURT:  Because we'll take a break and you

4  can work with Mr. Andrews as much as you wish.

5        I am going to list for everyone the materials I

6  studied in preparation for sentencing.  And, Counsel, if

7  there's anything in addition, please let me know that.

8        Mr. Moreno, you're before the Court on a plea of

9  guilty to count one of an indictment.  You pled guilty to

10  the federal crime of receipt of child pornography.

11  Congress took on the sentencing function by way of a

12  mandatory minimum.  The mandatory minimum sentence in law

13  is five years.  The maximum term is 20 years in federal

14  prison.

15        The plea agreement said that prosecution and

16  defense counsel can argue for any sentence within

17  statutory limits.  And of course recommendations by

18  prosecution and defense are not binding on the Court, but

19  I do seriously consider those recommendations.  You're

20  both very experienced lawyers.  You've agreed in the plea

21  agreement so restitution to the child victims of this

22  offense.

23        I did carefully study the presentence

24  investigation report.  There were no United States'

25  objections, Ms. Collins?

1          MS. COLLINS:  That's correct.

2          THE COURT:  No defense objections, Mr. Andrews?

3          MR. ANDREWS:  No, Your Honor.

4          THE COURT:  All right.  Now, Mr. Moreno, I want

5     you to understand that there was a time when a group of

6     judges, including me, met with the chair of the United

7     States Sentencing Commission.  And that commissioner made

8     clear that in his view it was judicial malpractice for

9     judges in pornography cases not to at least sample the

10    images, that is look at images in the case, because

11    written descriptions or verbal descriptions of the content

12    of the images is frequently insufficient or inaccurate.

13    Either the language used understates the seriousness of

14    the content or overstates the seriousness of the content.

15          So I have made it a practice, along with many

16    other federal judges, to at least sample the images.  And

17    in a collection as massive as the one you amassed, the

18    United States provided me with several hundred images from

19    the various devices that you did use.

20          Now, if that seems strange that judges look at

21    child pornography, I would say that as we do the federal

22    sentencing guideline calculation, you will see that the

23    content of the images with regard to torture, with regard

24    to the age of the victims and other matters are based

25    entirely on the content of images.

1          Just so we're clear about this, in order to

2    properly determine the federal sentencing guideline range

3    and whether or not those enhancements, all of which

4    increase your prison range under the federal sentencing

5    guidelines, here are examples of images described in the

6    presentence report, information taken from law enforcement

7    investigative reports:

8          A video of an infant boy lying on his back on a

9    board or object with his arms stretched out and restrained

10   with rope, and his legs spread open with rope around his

11   thighs.  A man straddled the infant boy and defecated on

12   his chest.  The infant boy was repositioned in a prone

13   position and restained again.  A hand was seen grabbing

14   and squeezing the infant boy's testicles.  The man then

15   straddled the infant boy, rubs his penis, and ejaculates

16   on the infant boy's buttocks.

17         Another example:  A nine-minute, 40-second video

18   of an infant boy.  A woman tied the infant boy up by his

19   ankles from the ceiling and duct-taped his mouth.  The

20   woman hit, burned, and penetrated the infant boy's anus.

21   This video was noted to be part of a series of multiple

22   videos in which this child was abused by multiple women.

23         And lastly, a 23-second video of an infant girl.

24   A dog is standing next to the infant girl, and a woman's

25   hand is holding the dog's penis in one hand and pushing

the infant girl's head toward it.  The woman pushes the
dog's penis in the infant girl's mouth, and the child
struggles to pull away.

Now you can put those words on a piece of paper,
but I'll tell you something.  When I look at those images
as the head of the U.S. Sentencing Commission suggested is
necessary in these cases, there is no way other than
looking at those images, which you saw, to get any idea of
how serious this case is.  And it does affect the federal
sentencing guideline calculations.  There were hundreds of
images given to me, thousands in your collection.

I have not decided on what your sentence should
be, so do not get the wrong impression.  I want to hear
from anyone who wishes to speak before I reach any
conclusions about a proper sentence.

But continuing on, then, there was a defendant's
sentencing memorandum which Mr. Andrews filed on your
behalf.  It's docket entry 43.  The request at sentence,
Mr. Andrews, is the five-year mandatory minimum.

MR. ANDREWS:  That's correct, Your Honor.

THE COURT:  With counseling and therapy to
follow on supervision.

MR. ANDREWS:  Of course, yes.

THE COURT:  Well, you point out, and it's well
supported by others, that, Mr. Moreno, you have a lifetime

of service in the Salvation Army.  Unquestionably true.
You did lose an eye as an infant to cancer, which is a
horrific experience for a child, and then going through
life you were teased because you have an artificial or
damaged left eye.

Your parents were constantly transferred --
these are all explanations as to what the background could
be for your criminal conduct subject to sentencing --
constantly transferred from one place to another because
your parents were ministers.

There was, I guess, a complete absence of any
discussion of sex or sexuality in your family.  And Dr.
Nehring makes a point about that, that you didn't have a
healthy adolescent development because of the restrictions
or limitations on openness in discussing sexuality as you
were growing up.

You do, Mr. Andrews says, and I'll get to your
letter, you take full responsibility for committing this
crime, and that you understand there are real children who
are actual victims.

Now, Mr. Andrews makes the point that the
internet system downloaded large amounts of pornography
without any interest in those images on your part.  It
was, as Mr. Andrews said, all-or-nothing download dumps.
You were in Kiwanis International, another form of

community service.  And Mr. Andrews reaches a conclusion

that fundamentally you're a good and caring man; and

numerous, numerous letters support that.

There were seven pages of certificates of

various accomplishments and appointments that you've had.

There were 37 pages of support letters.  Now, some of you

present may have written letters.  These are important to

me.  I cannot get insight into a person simply through

official sources.  When letters are written, then it gives

me a far broader view of what your life is; not just

focused on the offense of conviction, but on the other

aspects of your life, which is important for sentencing

because there's a point at which, of course, you'll be out

of custody on supervised release and back in the community

under supervision.

So some of the letters -- let me just say, I

studied all of them.  Your brother Albino Moreno wrote and

talked about this ridicule you received because of the

damage from the eye surgery as an infant, and that you're

a good man.  Cande Moreno, your baby sister; Catherine

Sand, your oldest sister; Daniel Moreno, your youngest

brother; Jane Hamberg, an aunt; Judy Moreno, your sister;

Ann Moreno, your mother.  Kelsie, your wife of 18 years,

says you're a good heart and have a giving spirit.  And no

doubt that's absolutely true, based on everything I have

in front of me from the letters.

Magdalena Suarez, your grandmother wrote. Cindy Eggers, mother-in-law, wrote. There were numerous, numerous letters from community leaders, people involved in Salvation Army leadership, people involved in your faith tradition in the church for which you were a pastor. I think without exception those letters all say they were shocked by the arrest.

But the other thing those letters make clear is that they really -- they know the nature of the charge, but they do not know anything else about the offense. And so that's understandable. That's the usual thing with people who are supporting a person being sentenced. There's no reason the public would know the details of these matters before a sentencing proceeding or a trial.

And so no disrespect on my part that people are writing very favorable letters, but they do not know the nature of your conduct.

Support groups are critically important coming out of custody, and you have a very large number of positive people of goodwill who intend to support you no matter the outcome here.

Now, I take it that there must be a motion for a downward variance in order to get to the five-year mandatory minimum from the federal sentencing guideline

1    range, Mr. Andrews?

2            MR. ANDREWS:  I will make such a motion now

3    orally, Your Honor.

4            THE COURT:  Let's do it as part of your

5    sentencing presentation.

6            MR. ANDREWS:  Fair enough.

7            THE COURT:  I inquired because I didn't see a

8    separate motion, which is, of course, not required.

9            There was a motion for restitution.  I believe

10   it is docket 40, but let me recheck that.  There was a

11   filing yesterday.

12           Docket 48 is the updated restitution request by

13   the United States on behalf of the identifiable victims of

14   the offenses who are requesting restitution.  So we will

15   take that matter up.

16           There were 124 pages of victim impact letters.

17   Identifiable victims of sexual exploitation of children

18   offenses have a system through which restitution can be

19   sought, the children all identified by pseudo names.  But

20   there are attorneys representing these people, I

21   understand most of them with no charge at all, just trying

22   to get restitution to these kids for therapy and other

23   experiences that they're having as a result of being

24   exploited.

25           So there were 124 pages of victim impact

1    statements, which I did review.

2          I did appreciate receiving your letter.  This is

3    not the type of case where it is at all an easy matter to

4    sit down and think as clearly as you can about your life,

5    the positive aspects of it, and the problems that lead up

6    to a criminal conduct like this.  So I most certainly

7    consider your letter.  I read it several times.

8          You, of course, say it was true you were bullied

9    because of your prosthetic left eye starting in first

10   grade, and that you internalized this kind of really

11   lifetime stress and comments by others.  You say the

12   beginning of your sexual dysfunction was in the second

13   grade; there was an issue there with apparently a

14   classmate or older school child who essentially performed

15   a sex act on you on a school bus, and that you say that

16   had an effect on you.

17         You note that you started watching child

18   pornography at age 21.  And I think at this point you're

19   41.  Is that right?

20         You progressed to more graphic content and

21   assembled thousands of images.  That's clearly true, from

22   what I've seen and what the presentence says.

23         You did detail your Salvation Army career, which

24   was for the most part exemplary.  And until 2019 you

25   became the Black Hills Area Coordinator for the Salvation

1    Army, which is the Salvation Army's mission in all of

2    Western South Dakota, a very large responsibility.

3           You say you did keep the child pornography a

4    secret for many years, and you did not seek help

5    because -- your words -- you did not seek help "because of

6    fear of rejection, of losing everything, of getting in

7    trouble." Which I appreciate reading that from you. But

8    we can talk more about that, that concept.

9           And, you say in your letter you're not trying to

10   make excuses, you're truly sorry, you want to apologize to

11   every victim. You say "every single victim" of the sexual

12   abuse and exploitation. And you make it clear you've lost

13   everything and you need therapy and treatment, with which

14   I certainly agree.

15          Dr. Nehring did a psychosexual evaluation, a

16   risk assessment, In February of 2022. I certainly read

17   that. The diagnostic impressions of Dr. Nehring are on

18   page 12 of this report.

19          Were there additional materials submitted for my

20   review, Ms. Collins?

21          MS. COLLINS:  No, Your Honor.

22          THE COURT:  Mr. Andrews?

23          MR. ANDREWS:  No, Your Honor.

24          THE COURT:  All right.  Well, there's going to

25   be much discussion of these federal sentencing guidelines,

1    Mr. Moreno.  Congress in 1987 put in place what's called

2    the Sentencing Reform Act.  As part of that, Congress

3    created a system that would at least by intent create

4    uniformity in federal sentencing, so someone with no

5    criminal history or a particular type of criminal history

6    could expect to receive the same prison sentence in any

7    federal court in the United States for the same crime.  So

8    the idea was in some ways a sense of fairness.  So if

9    you're sentenced in Los Angeles or New York City or L.A.

10   or Sioux Falls, your sentence should be roughly the same.

11          And you accomplish that by this very difficult

12   series of calculations called the federal sentencing

13   guidelines; a whole host of numbers that produce a range

14   of months of imprisonment which every federal sentencing

15   judge must consider but is no longer bound to follow as

16   part of sentencing.  In 2005, these were mandatory and

17   judges had to sentence within the federal sentencing

18   guideline range.

19          The Supreme Court wisely struck the mandatory

20   nature of the guidelines in 2005.  They're advisory only,

21   but they are an important component of federal sentencing.

22   I'm required to accurately calculate them.  And even with

23   no objections, I'm going to put the federal sentencing

24   guideline calculation on the record in the event any

25   reviewing court would need to see if an error was made.

1          So let's start in on that process.

2          We're also going to get to the point -- I'm sure

3    Mr. Andrews will make it clear -- that the other part of

4    federal sentencing is under a statute known as 18 United

5    States Code Section 3553(a).  That statute says the

6    federal judges must fashion and impose enough of a

7    sentence but not a sentence greater than necessary to

8    accomplishing the purposes of federal sentencing.  And

9    then Congress lays out in that law the purposes of federal

10   sentencing.  Each of those factors must be individually

11   considered and balanced in every case to produce a just

12   sentence.  And we will also engage in that process,

13   separate and apart interest the guidelines.

14          So if we turn to your presentence investigation

15   report, we find the beginning of the federal sentencing

16   guideline calculation on page 12.  Every federal felony is

17   given a starting point or base offense level under the

18   guideline system.  Here receipt of child pornography,

19   count one of the indictment, has a base offense level or

20   starting point of 22.  And here's where the content review

21   is critical, because these enhancements and the specific

22   offense characteristics have to be supported.

23          Specific offense characteristic:  If the

24   material involved a prepubescent minor or a minor who had

25   not attained the age of 12 years, increase by two levels.

1    That's an aggravating factor.  There were numerous,

2    numerous images of infants and children under the age of

3    12 involved in the pornography that you viewed and

4    collected.  So two levels are added.

5              A specific offense characteristic:  If you

6    distribute it in exchange for any valuable consideration

7    but not for money, trading images with others, so as to

8    increase your collection and provide images to people of

9    interest in that child pornography community, we could

10   call them.  You were indeed trading child pornography

11   images and video with others in order to acquire more

12   yourself.  That is supported by the factual basis

13   statement.  That's a major aggravating factor, adding five

14   levels.

15             Specific offense characteristic:  Adding four

16   levels if the images portray sadistic or masochistic

17   conduct or other depictions of violence, which many of

18   them do, or sexual abuse or exploitation of an infant or

19   toddler.  Numerous images are the exploitation and rape of

20   toddlers.  And so four levels are added for that

21   aggravating factor.

22             There is a specific offense characteristic for

23   the use of a computer or interactive computer service.

24   That adds two levels.

25             Specific offense characteristic is aggravating

1   in terms of the number of images involved in a case.  If

2   the offense involves 600 or more images, that's an

3   aggravating factor, increase by five levels.

4          That gives us an adjusted offense level of 40.

5          There's a two-level reduction in your favor,

6   Mr. Moreno, for accepting responsibility for committing

7   this offense, and I have no doubt that you sincerely

8   accept responsibility.

9          The United States requested a third-level

10  reduction because you avoided the use of prosecution and

11  court resources at trial.  That gives you a total offense

12  level of 37.

13         The guidelines also calculate criminal history.

14  That factors in.  But of course you have no criminal

15  history of any kind, so you're in the most favorable

16  sentencing category, criminal history Category I on the

17  sentencing table.

18         On page 19 we get statutory and guideline

19  factors for sentencing.  As I said, Congress set a

20  mandatory minimum of five years and a maximum of 20 years

21  in federal prison for this offense.  The guideline

22  calculation is a guideline range, which I must consider,

23  of 210 months to 240 months in federal prison.  So under

24  the guideline system, anybody in the United States could

25  expect to receive 17 and a half years at the low end and

1    20 years at the high end for this offense.

2            I'm required to impose supervision after custody

3    of not less than five years up to life on supervised

4    release.  And the guideline range is the same, five years

5    to life on supervision after custody.

6            Almost every federal felony is probation

7    eligible, but not when there's a mandatory minimum

8    sentence.  So there's no probation eligibility in this

9    case.

10           The special assessment imposed in every federal

11   felony sentencing is $100 for each count of conviction.

12   The reason it's mandatory in every case and due at the

13   time of sentencing is because that money goes into a

14   National Crime Victims Assistance Fund, and so that amount

15   is due immediately, if you haven't paid it.  I'm assuming

16   you're able to pay it.  If not, Mr. Andrews can tell me

17   that, and I'll waive the interest requirement on it so you

18   can pay it over the course of your judgment.

19           Now, Congress, in working through this exploding

20   part of our society known as child pornography, passed a

21   number of statutes which have impacts on monies owed as a

22   result of the commission of the offense.  One of those

23   acts is the Amy, Vickie, and Andy Child Pornography

24   Victims Assistance Act of 2018, which says in addition to

25   any other criminal monetary penalty, restitution, or

1    assessment authorized by law -- so given all those

2    things -- the Court shall assess not more than $17,000 on

3    any person convicted of an offense under certain statute

4    and other matters.  So restitution is mandatory under that

5    law.

6            There's a separate statute for restitution to

7    victims of sexual exploitation who are children.  It

8    doesn't apply because you're an indigent person.

9            Now, the guideline range for a fine in this case

10   is $40,000 to $250,000.

11           I want to hear the discussion about restitution.

12   I know there's been, as I said, a recent United States

13   filing seeking a certain amount.  If that's a disputed

14   amount, I need to know that.  If it's a stipulated amount,

15   I need to know that.

16           But those are the statutory and guideline

17   factors for sentencing.

18           Do you agree that that's an accurate statement

19   of those factors, Ms. Collins?

20           MS. COLLINS:  Yes, Your Honor.

21           THE COURT:  Mr. Andrews?

22           MR. ANDREWS:  Yes, Your Honor.

23           THE COURT:  Do you wish to confer with your

24   client?  Which is fine.

25           MR. ANDREWS:  If I may.

1          THE COURT:  Yes.  And if you need a break, you
2     just tell me if you wish to confer.
3               (Mr. Andrews and the defendant conferring off
4               the record.)
5          MR. ANDREWS:  We've conferred, Your Honor.  Mr.
6     Moreno indicates that he does understand everything we've
7     discussed so far.
8          THE COURT:  All right.  Well, feel free to ask
9     for another opportunity to speak to counsel, Mr. Moreno,
10    if you wish to have that.
11         So I'm going to adopt the presentence
12    investigation report as it is written.  Thank you,
13    Ms. Rhodes.  It's a very thorough report and helpful to
14    all parties involved here.
15         So the time has come to turn to you,
16    Mr. Andrews, Mr. Moreno.  We just received an email that
17    there are four people that wish to speak, which is fine if
18    they wish to do that.  So I'll turn to you to structure
19    the --
20         MR. ANDREWS:  Thank you, Your Honor.
21         I believe with the Court's indulgence, I would
22    prefer we start off with the people who would like to
23    speak on behalf of Mr. Moreno, and then I'll follow it up
24    with some brief argument, and that should do it.
25         THE COURT:  Well, that's just fine.  Take all

1    the time you need.

2          Now, if you wish to speak, there's a microphone

3    behind Mr. Andrews.  There is sanitation materials.  We

4    clean these because of the COVID realities.  And if you

5    wish to speak, please begin by introducing yourself so

6    Sheri has your name in our record in the case.

7          So Mr. Andrews, if would you coordinate this,

8    please, as to who wishes to speak first?

9          MR. ANDREWS:  Certainly, Your Honor.  If I may

10   consult with the family to see who would like to go first?

11         THE COURT:  That's just fine.

12         MR. ANDREWS:  Thank you.

13         THE COURT:  Good afternoon.

14         SPEAKER 1:  My name is Cynthia Eggers.

15         I'm grateful for a moment to be heard about this

16   tragic turn of events.  When this all came to light, it

17   not only impacted our families, but it impacted a nation.

18   Personally, I can attest to how he and his wife provided

19   services to local and surrounding communities at a time

20   when resources were out of their reach.  So many people

21   have been impacted by Javier's quiet and gentle generosity

22   and service.  Thousands of people are praying for him

23   today.

24         I am the parent of a child of sexual abuse.  Do

25   I wish I could have saved her?  Every single day.  Do I

1   wish I could have been there to save Javier too?  Every

2   single day.  And my hope is that Javier will be in a place

3   where he can be -- he can heal and learn about himself.

4   Because these are the kind of things that happen when

5   child sexual abuse goes unchecked.  Healing is important,

6   and it takes a lifetime.

7           Sir, we have a very close relationship with

8   Javier and a grand desire to maintain that.  We are hoping

9   for a site that provides services he needs but also allows

10  us to maintain a high level of support for him.

11          At this point, Javier must learn to trust that

12  there is a future waiting for him that is beyond what he

13  might be able to grasp at this present moment.  I hope he

14  has vision and perseverance, because everyone here today,

15  every family member and friend, has that for Javier.

16          My name is Cynthia Eggers.  I used to be

17  Javier's mother-in-law.  He made me his other mother.  He

18  is still my son, and always will be.  I am a no-filter old

19  lady.  I will always be the one to serve him the truth,

20  and that he can trust.

21          May God enlighten your vision.

22          THE COURT:  Thank you very much, Ms. Eggers.

23  This is a very difficult place to speak, and you have

24  spoken clearly on Mr. Moreno's behalf.

25          Good afternoon.

1      SPEAKER 2:  Hello and good afternoon, Judge

2  Viken.  My name is Judy Anodina Moreno.  I am Javier Clark

3  Moreno's second oldest sister.

4      My brother Javier did admit to the charges, and

5  I know it looks as if he's a bad person, a danger to

6  society.  But he's not.  He is a caring, loving person, a

7  brother, and an uncle.  And I would like you to know, as

8  well as my brother, that he has my support one hundred

9  plus percent.  And how he helped me through hardship, now

10 it's my turn as an older sister to help him.

11      No matter what your decision is today, Judge,

12 with all due respect, we thank you.

13      THE COURT:  Well, thank you for speaking.  The

14 support you and many others have shown will be critically

15 important when Mr. Moreno comes out of custody to reenter

16 the community and family.  So it's a powerful statement

17 that you're all here.

18      Good afternoon.

19      SPEAKER 3:  Good afternoon, Your Honor.  My name

20 is Al Moreno.  I'm Javier's older brother.  We're a year

21 apart.  I'm sure you've read my letter.

22      THE COURT:  I certainly did.

23      SPEAKER 3:  I'm in full support of my brother.

24 You know, something a lot of people deal with is

25 addictions, and addictions get deeper and deeper.  And

1    unfortunately, it went this way with my brother.

2         I wish -- I know as we were younger, we were

3    very close.  We were able to speak to each other about a

4    lot of things.  But as we got older, you know, life

5    happens.  But I hope my brother knows that I'm here to

6    support him when whatever the sentencing may be, whenever

7    he's out, he has a place.  He has a job.  And he'd be well

8    loved and taken care of by all his family.

9         You know, I hope you take into consideration the

10   kind and gentle guy he is.  He's been through a lot as a

11   youth.  You know, I shared in my letter, Your Honor, that

12   it pains me to not be there to protect him like I did

13   growing up.  When people were making fun of him and he

14   would just put his head down, I was the one fighting and

15   getting kicked out of school.  And this kind of takes that

16   protection away, and it hurts me.

17        And I know it's by his actions, Your Honor, but

18   just please take into consideration who he is as a person

19   and an understanding that institutionalizing doesn't

20   always work, and therapy is something that he needs.

21        But we love him, and we fully support him.

22        THE COURT:  Thank you, Mr. Moreno, for speaking

23   as well as writing.

24        Good afternoon.

25        SPEAKER 4:  Good afternoon.  Your Honor, thank

1   you for allowing me to speak today.

2           I'm Kelsie Moreno, and I was married to Javier

3   for 18 years.  And I know him better than anyone else that

4   you will hear from.

5           I'm really grateful for the outpouring of

6   support from this community and many others that we have

7   served in.  That was quite a comfort.  Because all of

8   those people know his giving spirit, his generous heart.

9   And I know you've heard from so many whose lives were

10  impacted for good by him, and I'm grateful for that.

11          I know there's a list of stuff in these file

12  folders that would lead people to believe he was a

13  terrible person.  And he did do terrible things.  But if

14  you judge him by that alone, it's not the whole truth.

15  The truth is, Your Honor, that after living with this man

16  for 20 years of my life, I can tell you that he is a good

17  man who suffered horrible things.  And instead of getting

18  help, he numbed his pain another way, and it was terrible.

19  And he's admitted that, and I'm grateful that he took

20  responsibility for it.

21          He told me shortly after that he was arrested

22  that he finally felt free of some things that he longed to

23  be free from for so long.  And I believe that day

24  15 months ago was just the beginning for him.  I felt like

25  our lives shattered, but it was just the beginning for

1  him.

2        I owe a great debt of gratitude for Investigator

3  Fagerland for stopping him.  And today, on what we should

4  have been celebrating as our 19th wedding anniversary,

5  we're going to hear another number that defines his

6  immediate future.  And I can confidently say that whatever

7  sentence you decide that he is rightly subject to, that

8  not a day of it will be wasted by him.  He will come out

9  stronger and ready to rebuild.

10       My most fervent prayer for weeks now is that he

11  will be finally able to accept the help that he so

12  desperately needs so that he eventually can return to

13  society.  And I believe that he will continue, continue to

14  impact those for good, those that he's able to serve.

15       And so I thank you today for considering all

16  that he is, not just the list of crimes in a file folder,

17  and for considering all that he is capable of, not just

18  the crime that he will be sentenced for today.

19       Thank you.

20       THE COURT:  Well, Ms. Moreno, it takes great

21  courage to come on this day and speak so clearly on behalf

22  of your husband of so many years.  It is a great tragedy

23  for your family and for the community of faith in which

24  you and Mr. Moreno have been so heavily involved.  It is,

25  of course, a day to at least as far as the law can

1  accomplish it, come to some just resolution for the crime

2  committed.  So I appreciate your writing and for your

3  speaking today.

4              SPEAKER 4:  Thank you.

5              THE COURT:  Mr. Andrews?

6              MR. ANDREWS:  Thank you, Your Honor.  I

7  appreciate the Court allowing Mr. Moreno's family to speak

8  on his behalf.

9              THE COURT:  Of course.

10             MR. ANDREWS:  Obviously this is a horrible

11  situation we all find ourselves in.  The nature of the

12  images and the crime speak for itself.  Mr. Moreno

13  obviously offers no defense for what he has done.

14             In my sentencing memo to the Court, I tried to

15  convey the idea, and I think it's not illegitimate, it was

16  not meant to downplay, but a lot of the times, as the

17  Court is well aware -- we have done more of these cases

18  than I can even wrap my mind around -- that a lot of times

19  these things come in packages, for lack of a better word.

20  And it may not be what the individual acquiring them is

21  looking for, per se; but unfortunately they're there, and

22  he has to be held accountable for them.

23             THE COURT:  May I make is point about that?

24  Because it's important.

25             I know in your sentencing memorandum you talked

1    about the massive download of images in which, I take it

2    in many cases, you meant that he had no interest in them,

3    because of the nature of the internet download for this

4    exploitation of children offense.  Docket 44, which is

5    your client's letter to me -- and I raise this now because

6    I want to thoroughly understand your position and

7    Mr. Moreno's -- it says on page 3 of the letter at the

8    bottom, "By October 2020 my downward spiral had begun.  I

9    began a descent from which I could not recover.  By year's

10   end, that would be 2020, I had acquired thousands of

11   images and videos simply because access to them was so

12   easily obtainable.  There were even Cloud storage links

13   with thousands of images and videos, literally gigabytes'

14   worth, could be downloaded with just a click of a button.

15   Even though I received content I didn't like, I would keep

16   it to share it with those who did.  In a very strange way,

17   I felt accepted by this community."

18        So I took issue, when I read Mr. Moreno's

19   letter, with what you had written previously and filed in

20   the memo.  Downloading images that Mr. Moreno didn't seek

21   out or like that came as part of these massive dumps, as

22   you say, he's telling me you actually kept those for

23   purposes of trading them for images in which he was

24   interested, and trading them off to people who are

25   interested in the content of the images in which he had no

1    interest.

2          He's taken a pretty heavy increase in the

3    guidelines for the distribution, so that's accounted for

4    in the guidelines.  But it doesn't seem to me like this is

5    a case where we have an innocent, massive download of

6    images a person doesn't pay any attention to the things

7    they're not interested in, which I've heard in other

8    cases.  But here I think the images were intentionally

9    saved even if they weren't arousing to Mr. Moreno, so that

10   he can engage in further distribution.  Which of course

11   just perpetuates the industry, whether there's pecuniary

12   gain or not, of the production and distribution of child

13   pornography.

14         So if you want to enlighten me on that, or if

15   Mr. Moreno does, I'd be interested.  If you want to just

16   leave that alone, that's fine with me.  Your client may

17   want to speak to you.  It looks as though he does.

18             MR. ANDREWS:  Then give me a moment, please.

19             THE COURT:  Take all the time you need.

20             MR. ANDREWS:  Thank you.

21             (Mr. Andrews and the defendant conferred off the

22             record.)

23             MR. ANDREWS:  Thank you, Your Honor, for

24   allowing us that brief break.

25             Your Honor, I think the point I was trying to

1       make is -- and look, Mr. Moreno has admitted he held on to

2       these even though they had no personal interest to him,

3       for trading purposes.  And I understand that is covered by

4       the guidelines and whatnot.

5               I did, at least, hopefully wish to convey that

6       some of these images, the more horrific ones, are not

7       images that he personally had an interest in.  Maybe I'm

8       just trying to split it too finely.  And I understand that

9       he turned around, essentially, and used them, even if he

10      didn't see them.  He knew they had value to other people.

11              But I did at least want to try to convey the

12      idea to the Court that many of these images were not of

13      personal interest to him.  I didn't mean to imply that

14      they weren't used or anything like that to trade and

15      whatever.  I guess that's just the nature of these file

16      sharing programs these days.

17              That was the only thing.  I did not mean to try

18      to downplay what he did vis-a-vis the trading, but I did

19      at least want to convey the impression to the Court that

20      while he possessed some of these images -- and I don't

21      need to elaborate on what they're like -- they were not of

22      personal interest to him.

23              And I think some of that was discussed in the

24      report with Dr. Nehring in terms of what he was looking

25      for versus what he possessed.  That's the only point I was

1     trying to make with that.

2         THE COURT: Well, that's just fine. Mr. Moreno

3     pretty much cleared it up in his letter. And I appreciate

4     your candor, sir, in writing. I interrupted you.

5         MR. ANDREWS: Not at all, Your Honor.

6         And certainly I was not trying to argue with

7     cross-purposes with Mr. Moreno, who knows his situation

8     better than any of us.

9         As I said, Your Honor, is this is a terrible

10    situation we all find ourselves in. These crimes are --

11    you know, the horrific nature of them speak for

12    themselves. And unfortunately, in this particular case we

13    have them committed by an individual here, Mr. Moreno, who

14    has essentially dedicated his entire adult life to try and

15    help other people through his work with the Salvation

16    Army, an organization in which he was almost born into,

17    for lack of a better word.

18         He has sought and been, from all accounts that

19    I'm aware of and we have presented to the Court, very

20    successful in what he was doing with the Salvation Army in

21    terms of community support, community outreach; even in a

22    short time with the Black Hills, the work they were able

23    to do regarding getting supplies down to the Pine Ridge

24    during COVID and whatever. His work with the Salvation

25    Army and his help and everything that I am aware of has

been nothing less than exemplary.  That, in a sense, makes
the whole situation that much worse in terms of trying to
balance the individual from the actions.

And I'm not trying in any way to draw any type
of equivalency to the harm that is done through these
images and the videos and the trading, but I would like to
emphasize for the Court that Mr. Moreno is a man who's now
essentially lost everything.  I'm not looking to say that
there's not a measure of punishment required.  But a
lifetime commitment to the Salvation Army is gone.  His
marriage is over.  And while they can still remain
friends; but under the rules and policy of the Salvation
Army, were the two of them to stay married, I understand
she would lose her commission in the Salvation Army, which
would in a sense be a double blow against the community
that the Salvation Armies service.

But he understands that the shame he's brought
upon himself, his family -- and to their credit, they've
managed to stay by him this entire time -- and to the
Salvation Army itself, which is especially painful to
Mr. Moreno because that is an organization that he loves.
That is where he spent his life trying to help others.

And the notion that he, through his actions, may
have compromised the mission of the Salvation Army and at
least the public perception of the Salvation Army is

1   something that weighs especially heavy upon him in this

2   whole context here.

3           I think it is important that the Court see that

4   he does maintain the support of his family, friends,

5   people that he has helped.  And to help realize that there

6   is, if you will, a light at the end of the tunnel for him.

7   As Dr. Nehring indicated in his psychosexual evaluation to

8   the Court, he's not a man beyond saving.

9           By all the statistical analyses and tests he was

10  able to administer, Mr. Moreno appears to be the type of

11  individual who's not likely to re offend.  So it's not a

12  situation where the likelihood he would go out and act

13  upon these impulses with actual children, he said, is a

14  very low probability.  And even to relapse into viewing

15  child pornography, I would submit to the Court, based on

16  what Dr. Nehring says, these are things that can be

17  treated.

18          Get to the underlying -- and I think we've kind

19  of touched upon some of that -- why this happened in the

20  first place, how do we keep it from happening again, dig

21  deep into the causes of why this is going on, and come up

22  with appropriate treatment.  And then when he is released,

23  there are ways to prohibit internet access, to deny him

24  the ability to even get into the internet to indulge in

25  this type of behavior again.

1    So I would respectfully request of the Court

2    that I think if the Court looks at the totality of the

3    circumstances, and this is where 3553(a) comes in,

4    balancing what he has done with his life, what he has done

5    for other people versus the harm that he has caused, I

6    would respectfully submit to the Court that, first, a

7    guideline sentence would be greater than sufficient

8    punishment under these circumstances, as bad as it is.

9    I think as the Court understands better than I

10   could ever express, it's a balancing question.  What do we

11   take a man who has lived a good life, a good life on

12   behalf of others, weigh that against -- for lack of a

13   better word -- of the ill that he has done in terms of

14   these images and the ripple effect that they have as

15   continuing to live on year after year.  I see some of

16   these restitution claims, a crime that goes back ten years

17   and more, and these just keep repercolating through the

18   internet.

19   That all having been said, Your Honor, I think

20   on balance I would respectfully submit to the Court that

21   the five-year mandatory minimum in this particular case is

22   an appropriate sentence.  I will orally move for a

23   downward departure.  With 3553(a) I don't know that that's

24   necessarily required.  But here I am requested that the

25   Court exercise its discretion, consider the good works

1  he's done, consider the potential for rehabilitation; and

2  respectfully, given his vocational background and his

3  training, he's the type of individual who'd be well-suited

4  to help guide others who find themselves in this situation

5  away from this type of behavior.

6         And I think unlike the -- for lack of a better

7  word -- the average defendant here, he is uniquely

8  positioned to tell his story when the time comes and

9  hopefully deter, even if it's just one or person, from

10  engaging in this type of behavior; that there can be some

11  type of positive outcome of this whole situation.

12         So that would be my request, a five-year

13  mandatory minimum.  I don't know if the Court wants to

14  address the restitution issue now or at a different point

15  of the proceeding.  I'll leave that up to you.

16         THE COURT:  Let me first ask you, you're making

17  a motion under 18 United States Code Section 3553(a) for a

18  downward variance to the mandatory minimum.  Is there a

19  guideline departure that you're urging in terms of a

20  downward departure using the guidelines themselves?  Or

21  you're relying on a downward variance?

22         MR. ANDREWS:  I'm relying -- sorry.

23         THE COURT:  Either one is fine by me.  But if I

24  missed a guideline that is supporting the departure, I

25  would request to know that.

1    MR. ANDREWS:  This would be more of a downward

2    variance request, Your Honor, based on 3553(a), which is

3    controlling.  Although I understand the law the guidelines

4    serve, I think that is appropriate.  We understand what it

5    is.  But if we look at 3553(a), I think that enables the

6    Court to take a fuller measure, a fuller picture of the

7    defendant and his conduct.  And I respectfully would

8    suggest to the Court that in light of those factors, the

9    five-year mandatory minimum is an appropriate sentence

10   under this situation.

11        THE COURT:  Well, thank you for clarifying.  I

12   understand your position.

13        Now, what is Mr. Moreno's position with regard

14   to the restitution figure put forward by the United

15   States?

16        MR. ANDREWS:  We understand, I believe, the

17   United States restitution figure -- I'm sure Ms. Collins

18   will correct me -- is $148,500.

19        Your Honor, the restitution figure I would

20   suggest to the Court would be $84,000.  And that is --

21   assuming I've done my math correctly, it appears we have

22   28 identified victims?  And we would ask just for the

23   minimum $3,000 per victim, based primarily when there's

24   such a scope of materials to try to cherry-pick who may be

25   entitled to more and who may be entitled to less, it's

hard to quantify that.  And I know and appreciate the government has done what they can with that regard.

But our position is that the $3,000 floor set by Congress is sufficient under these circumstances to provide some compensation to these victims, and that's what we'd be asking for.  So my quick math was $84,000, $3,000 per 28 identified victims.

THE COURT:  All right.  Well, I'm sure I'll hear from Ms. Collins on that subject and then determine whether that's a decision I can make today or whether further hearing is necessary, which is fine.

MR. ANDREWS:  Sure.

THE COURT:  Disputed restitution amounts are the subject of hearings with burdens of proof in place.

Thank you, Mr. Andrews.  You and Ms. Collins has invested a very substantial amount of time and professional skill in this case because it's an important and serious case.

Mr. Moreno, let me make sure that you and others understand.  I have no disrespect in any way of the Salvation Army.  I grew up east of the Missouri River in South Dakota.  My father was on the board of directors of Salvation Army in that region for years.  He was one of the two organizations in which he invested considerable time and money.  So I have no umbrage whatsoever

1    concerning that organization, just so we're clear about

2    that.

3           You have every right to speak today, Mr. Moreno,

4    if you wish to do so.  Please take your time.  This is an

5    extremely difficult environment in which to be heard.  And

6    you're welcome to remain seated.

7           And if you'd like to read, that's perfectly

8    fine.  But please read slowly, because Sheri must take

9    down every word spoken in the courtroom.

10          THE DEFENDANT:  Thank you.

11          Your Honor, Ms. Collins, ladies and gentlemen,

12   as I'm here before you awaiting the pronouncement of the

13   sentence I'll receive as a result of the crime which I've

14   committed, I wish to express a few things, and I will do

15   my best to be brief.

16          Child pornography is one of the most horrific

17   activities one could ever be engaged in.  The abuse, the

18   pain, the trauma inflicted on these poor, innocent victims

19   is nothing any child should ever have to endure or live

20   with.

21          Unfortunately, these children are victimized

22   over and over again as the images of their abuse is shared

23   over the internet and through social network apps.

24          So to each and every victim depicted in any

25   image or video that has been shared online, I want to tell

1    you that I am truly, truly sorry.  I'm sorry for the abuse

2    you have suffered.  I'm sorry for the ongoing trauma.  And

3    I'm sorry that I have had any part in the revictimization

4    that you experience.

5           Although I don't know any of you personally, and

6    you may never hear these words of mine, I'm sorry and I

7    hope that you would find it in your hearts to forgive me.

8           Next, I would like to apologize --

9           THE COURT:  Take your time, sir.

10          THE DEFENDANT:  I would like to apologize to my

11   wife of what would have been 19 years today.  I'm sorry

12   for all the pain I have caused and for all of the

13   emotional torment you have endured.  Although we're no

14   longer married, you are a treasure to me.  Thank you for

15   your love and for your continued support.

16          To my family, I'm sorry for the hardship I have

17   brought and for bringing shame to the family name.  I'm

18   sorry for the deep hurt and sorrow I have brought to you

19   all.  I thank you for your continued love and support

20   through it all.

21          I would also like to apologize to the Salvation

22   Army and to my divisional and territorial leaders.  I know

23   that this has been a great disappointment.  I failed as a

24   leader, both professionally and spiritually.  You had

25   great confidence in me, and I let you down.

1          To each and every congregation I have blessed to

2    lead, I'm sorry for failing you.  But hold on to the truth

3    that I have taught, because that came from the heart and

4    was motivated by the spirit of God himself.

5          And to the staff, volunteers, and board members,

6    you also had great confidence in me and held me in great

7    esteem.  I'm sorry that I have let you down.  I pray that

8    you may continue in the cause to meet human need without

9    discrimination.

10          To the Rapid City and Black Hills area

11   communities, I want to apologize to all of you.  I failed

12   in my example as a community leader.  Instead of being a

13   light, my actions have cast a shadow of darkness over a

14   great community with many great people.  And for that, I

15   am sorry.

16          I never would have imagined that this would be

17   my life.  But pornography is an evil that can take you

18   down the dark, destructive path.  Donald Miller says in

19   his book, "Searching for God Knows What," a person's mind

20   can do all sorts of things his heart would never let him

21   do.  This is so true for me.

22          All of the good I have done has come from the

23   depths of my heart.  Unfortunately, my mind had me doing

24   some very shameful things.  But throughout the course of

25   my incarceration over these last 15 months, I have been

working hard on getting my mind to line up with my heart,
through a lot of book reading, Bible study, and prayer.
In this way, I know that I can be who I truly am.

Our example should flow naturally out of our
character or the kind of person we truly are, not what
others say or what we may want others to think.  I'm
wholly committed to working on becoming who I know I truly
am.

Being a Minnesota native, I was drawn to the
book "Lake Wobegone Days" by Garrison Keeler, in which he
wrote it isn't true that time heals all wounds; sometimes
they get worse if you don't do something about them.

I nailed what I thought was armor to shield me
from the pain of rejection, were actually shackles and
chains that bound me.  What I thought were weapons to
protect me from getting hurt by others were actually traps
and snares clamping down on me.  When I thought I had been
freed, I was actually being held back like a dog on a
leash.  In the end I learned to shut off and shut down
rather than acknowledge that I needed to ask for help.

And what I've come to realize is it wasn't just
freedom that I was looking for; it was deliverance.  I
needed to admit my helplessness so that I could be
delivered from that bondage, so that I could be free from
all that implies, and free to become all that He wants me

1    to be.

2         I know that it's possible, because God's grace

3    is sufficient, and His powers made note in my weakness, no

4    matter what that thorn may be.  Truth be told, we're all

5    broken.  We've all hurt someone and have been hurt.  Yet

6    each one of us is more than the worst thing we've ever

7    done.  As Thomas Murton said, we are bodies of broken

8    bones.  Being broken is what makes us human.  We all have

9    our reasons.  Sometimes we're fractured by the choices we

10   make.  Sometimes we're shattered by the things we would

11   have never chosen.  But our brokenness is also the source

12   of our common humanity, the basis for our shared sense of

13   comfort, meaning, and healing.  Our shared vulnerability

14   and imperfection nurtures and sustains our capacity for

15   compassion.

16        So what are we left to do?  Brian Stevenson in

17   his book Just Mercy, says by simply punishing the broken,

18   walking away from them or hiding them from sight only

19   assures that we remain broken, and I am too.  I am broken.

20   I am vulnerable.  But it is in my vulnerability that I

21   admit my weakness and commit myself one hundred percent to

22   a resurrection of myself where the old is gone and all

23   things become new.

24        I know that giving up addictions and compulsive

25   behaviors is not easy, but I have the support of family

1  and many friends by my side.  I'm committed to seeking

2  help through treatment and counseling.  And I'm living in

3  the power of the Holy Spirit to guide me and help me.  I

4  know that I can and will be a productive and law-abiding

5  member of society, making restitution for my crime and

6  contributing as much good as I possibly can.

7  In Luke 13, versus 6 through 9 it says,

8  "Then Jesus told this story:

9  "A man planted a fig tree in his garden.  And

10  came again and again to see if there was any fruit on it,

11  but he was always disappointed.

12  "Finally he said to his gardener, I've waited

13  three years, and there hasn't been a single fig.  Cut it

14  down; it's just taking up space in the garden.  The

15  gardener answered, 'Sir, give it one more chance.  Leave

16  it another year, and I'll give it special attention and

17  plenty of fertilizer.  If we get figs next year, fine.  If

18  not, then you can cut it down.'"

19  Your Honor, I'm asking that you give me a

20  chance.  I am committed to tending to this tree and will

21  show you and everyone else that it can bear good fruit.

22  Thank you, and may God bless you.

23  THE COURT:  I respect your speaking under the

24  most difficult of circumstances, Mr. Moreno.  You are

25  thinking clearly, now, about your criminal behaviors and

1    the exploitation of these children; at least without the

2    benefit of therapy, clarity that you've been able to

3    achieve on your own at this point.  There will be more

4    clarity going forward, I'm sure, because there will be,

5    after custody, opportunities through United States

6    Probation on supervised release for appropriate treatment,

7    therapy, and some guardrails in place to protect the

8    community.

9               Thank you for speaking today, sir.

10              Mr. Andrews, further matters for the defense?

11              MR. ANDREWS:  Not at this time, Your Honor.

12   Thank you.

13              THE COURT:  All right.  Thank you.

14              Ms. Collins, the United States' position,

15   please?

16              MS. COLLINS:  Thank you, Your Honor.

17              The defendant described himself vulnerable and

18   broken.  I would submit to you that the real vulnerable

19   and broken were the ones that he exploited over two

20   decades to the tune of what the guidelines calculated at

21   over a million images of child pornography.

22              And while I understand there are people here

23   that are supporting him, and that is good -- hopefully

24   when he gets out they can be helpful to him -- and I

25   understand they don't know the horrific nature of what it

1    was that he did.  But I'm also thankful for other people

2    that are here, and they are the people that have dedicated

3    their careers to stopping people like Mr. Moreno; and that

4    is the people from the ICAC unit.  And they are here

5    because of the kids.

6           Your Honor, I want to address something first

7    before I go too far.  The claim that this was a mass

8    download case and somehow these images just happened upon

9    his devices is utterly contrary to the evidence.  The

10   evidence was on the devices that the images were found and

11   in his Kik account.  There was repeated search terms for

12   exactly what he located:  Violent images of child

13   pornography.  And not just a couple of searches, not just

14   one or two on a given day and then a thousand of images

15   just magic'd into his account, that is not what happened

16   at all.

17          He diligently sought these child exploitation

18   images over decades.  And he knew exactly what he wanted,

19   and he masturbated to it.  That's an important fact that

20   has been completely unmentioned up to this point.

21          This was not about trading and somehow making

22   himself feel better.  It was about his sexual needs and

23   the fact that what fulfilled those sexual needs was the

24   horrific abuse of babies and the giant collection that was

25   not even adolescent children.  I mean, Your Honor is

1   familiar with many different collections of many people.

2   His was horrible; images that will haunt most of us that

3   had to see them because of him for the rest of our lives.

4       A little boy that you mentioned, being hung up

5   and burned.  Another little kid being urinated on.  And

6   just example after example of those cases that you can't

7   even imagine what it would be that could even cause a

8   person to do this, let alone want to watch it.  And as

9   this Court is well aware, sometimes it's not what we're

10  seeing that's the worst in these videos; it's the sounds.

11  And I would submit to you that the cries from these

12  victims in this case were some of the most horrific,

13  because they were little babies.

14      And I'm not exaggerating.  You saw them.  They

15  were infants being penetrated vaginally and anally by

16  adult penises and by other objects that were forced upon

17  them.  One of the ones that really sticks in my mind was a

18  seven-to-ten-year-old girl with her arms and legs

19  stretched apart, possibly restrained off camera.  The

20  girl's mouth was taped, close pins attached to her nipples

21  and labia.  She has bruising to an eye, possible scarring,

22  dried blood on her face, and words "gang rape me" was

23  written across her chest, and "incest" across her vulva.

24  This is just one example of the violent nature of the

25  videos he sought and obtained.

1          Your Honor, this was not a case where he was

2     just innocently looking for barely legal images of child

3     pornography.  His search terms made clear -- and he

4     admitted to them in the PSR -- search terms made clear he

5     was looking for exactly what he got, which was these

6     exceptionally violent, disturbing, horrific images of

7     child pornography.  Again, those are the ones that will

8     stay with many of us for the rest of our lives.

9          A person doesn't masturbate to images that don't

10    sexually arouse them, and he admitted to doing that.

11         To his credit, he did take responsibility.  He

12    accepted responsibility early, and he was given the

13    benefit of that acceptance.

14         I am asking for a sentence at the high end of

15    the guideline range.  And it is my experience before the

16    Court that the Court will likely consider the computer

17    usage and possibly will reduce when it varies in its

18    consideration down that two levels.  And if the Court is

19    not intending on doing that, then I apologize for bringing

20    it up.

21         But as far as the typical calculation, then that

22    would mean that his guideline range would be at the low

23    end, 14 years, to the high end of 17.5 years.

24         Your Honor, a sentence of five years would be a

25    gross disparity with other sentences this Court has handed

down.  This Court has given many people five years, and many of those people had in the double digits of images that were nowhere near the horrific nature of this type. He had over a million images, and he had two decades to get them put together.  I don't believe for one second that he was not going after exactly the images that he had, and the evidence entirely supports that.

That is a justified sentence in looking at both the guidelines and also looking at the 3553 factors, most importantly the nature of the offense.  And I've already detailed some of these images, and I certainly don't mean to -- mean to go over them too much.  But I also don't want to lose focus in this case.

Sometimes tears from defendants and family members can cause us to kind of put those -- those things to the side.  And I would ask you not to, because there was also crying in these videos from these kids; crying because they didn't have an ability to protect themselves, didn't have the ability to make sure or to ensure that they weren't going to be subjected to this and then subjected to the exploitation over and over for the sexual pleasure of men like Mr. Moreno.

Your Honor, I would offer that this Court has read many psychosexual evaluations, and I'm not going to belabor it too much.  But I was highly concerned by

Dr. Nehring's psychosexual evaluation.  And because of
that, Mr. Andrews permitted me to speak to Dr. Nehring.
And I would submit to you that page after page shows that
he was very biased.  This was a psychosexual evaluation
obtained pre-plea, and it just simply was not reflective
of actual reality; part of which is concerning in that he
was never able to really explain to me was why it is that
a person who discloses bullying -- which is horrible.
Bullying is horrible.  Nobody would want to say that
somebody should be bullied for their appearance.  I'm
certainly not saying that.  But it's also not an excuse.

And certainly a very minor sexual experience
that happened during sexual development is not a reason to
be trying to protect yourself and therefore downloading
images of child pornography.

He had a girl rub up against him on a bus.  If
every person that had something sexually confusing happen
to them in development decided it was okay to exploit
children to make them feel better, I would submit to you
that we would have a horrible problem even worse than we
already do.  It's not an uncommon thing.  And he was never
able to explain to me why it was that he took that into
such heavy account when trying to determine why it was
that he did this and whether or not he was a high risk.
He just simply couldn't explain it to me.

1          I left our second phone call basically just with

2     my hands in the air like I don't -- I don't get what this

3     guy's saying.  He's just kind of supplementing things that

4     benefit his client, which I think he did with Mr. Moreno.

5          With regards to the restitution, Your Honor, I

6     asked specific amounts for each victim; not

7     cherry-picking, not arbitrarily, but based on the actual

8     number of images in Mr. Moreno's collection.  So the

9     minimum is $3,000.  And so the kids that are identified --

10    and I would like to correct something -- there are far

11    more than 28 identified victims.  There's only 28 that

12    sought restitution, but there was hundreds upon thousands

13    of victims.

14         And then from that group of -- from that million

15    images, then NCMEC is able to identify hundreds.  And then

16    of those when we send letters, victim impact statements,

17    to known contacts.  They respond.  And that got it parsed

18    down to 28.  There was far, far more, both known and

19    unknown victims.

20         And so looking at that, there were some victims

21    that only had one image that were seeking restitution.

22    And then there's others that had hundreds.  And, some of

23    the lower amounts sought, their images were some of the

24    really bad ones.  And so -- well, they're all bad.  I'm

25    not trying to say that.  But trying -- on the scale, more

1    horrific than others.  And so the amounts were not

2    arbitrary.

3            And so I would ask that the Court impose them as

4    sought.  And certainly if the Court wants to have a

5    hearing, we would oblige, because that is the appropriate

6    amount of restitution for each one of these kids that he

7    individually harmed.  These are not just random child

8    pornography victims.  These are kids that were found in

9    his -- his accounts that he masturbated to.

10           Your Honor, I know that the urge is to use the

11   fact that he served in the Salvation Army as a mitigator,

12   and that's certainly how it's been presented to you.  But

13   I would offer a contrary position, which is that when a

14   person is in a position of trust, they owe even more.  And

15   basically, as he was going through and explaining in his

16   letter his career and what he thought he did, if you think

17   about each day that he went home or that he used child

18   pornography at work and masturbated to it all of these

19   different times was not him serving anyone but himself.

20           And so him being in a position of trust, I would

21   say is certainly an aggravator.  And I would like to echo

22   what the Court said:  I have a great deal of respect for

23   the Salvation Army.  Nothing about this in my mind mars

24   them.  They had no idea as an organization that Mr. Moreno

25   was engaged in such a horrific acts on their time.

1    Your Honor, again, I would ask for a high-end

2 sentence.  It takes into account the number of images.  It

3 takes into account the nature of the images.  Any type of

4 downward variance from that basically would be saying,

5 other than the computer usage, the two levels for that --

6 I would acquiesce that the Court does that typically --

7 but otherwise it would be ignoring the number, the

8 millions of images.  It was over a million images as

9 calculated by U.S. Probation.  And that's actually low.

10    It could have been higher in the sense that the

11 Court could aggravate by variance about the number.

12 Because 75 images per video is the minimum that the Court

13 is supposed to be utilizing.  And he had several very

14 lengthy videos that certainly the Court could use to

15 aggravate that, and I'm not asking for that.

16    I'm asking for a sentence of 17.5 years, and he

17 deserves every day of it.  These victims went through so,

18 so very much, and he exploited so many kids that it just

19 can't be forgotten.  And a message must sent to society,

20 this community, and frankly anybody who potentially is

21 looking at this and thinking maybe I should use this,

22 maybe I should find an excuse and start finding an excuse

23 to exploit children to fulfill my sexual needs.

24    I am asking an extended period of supervised

25 release.  I think he needs more than normal, considering

1    everything that this Court has seen and the nature of the

2    images and, again, the number of images.  So I am asking

3    for the guideline range sentence at the top end.

4         Thank you.

5         THE COURT:  Well, thank you, Ms. Collins.  And

6    as I said at the conclusion of Mr. Andrews' presentation,

7    the amount of time and professional skill that you and

8    Mr. Andrews have put into this case is very important.  It

9    certainly assists me in fashioning what the law would

10    consider a just sentence.

11         You know, next month, Mr. Moreno, I will have

12    been on this bench for 13 years.  I have seen substantial

13    number of child pornography cases -- receipt, possession,

14    distribution, production cases where a person being

15    sentenced has actually produced the violent videos of the

16    exploitation of children.

17         And so it is clear that there is a range of

18    conduct which appears in child exploitation and

19    pornography materials.  And the guidelines do take that

20    into account by adding points for various aggravating

21    factors, which has happened in your case.

22         Years ago we used to see images like the ones

23    you collected, they would be out of the Philippines, out

24    East Asia, Russia, and Eastern Europe.  There weren't any

25    American kids involved in any of that.  But in more recent

years, it's now become clear that the people producing,

collecting, and viewing the images are looking at

home-grown American kids. You could tell it from the

setting they're in. For the most part, that's what we had

here.

In the range of experience that I've had looking

the many thousands of images in preparation for sentencing

in these cases, there is a whole spectrum of behaviors

involved. I would have to say that a substantial number

of the images I viewed, which I'm sure was over several

hundred in preparation for sentencing, are among the most

disturbing, violent, and exploitative images I have ever

seen in any case. And I would add to that the 20 years I

spent defending cases, including cases of this nature,

when I was in a different function as a lawyer.

There are images here -- I mentioned a few of

them at the outset -- which really go beyond what anyone

would expect another human would do to a child, or an

adult, for that matter. Here, a very substantial number

of the images that I did view are not adolescents; these

are not 16 and 15 year old kids. They are infants, some

of them clearly are less than a year old. One-, two-,

three-year-olds. When children of that age are sexually

penetrated by an adult penis, the U.S. Court of Appeals

has found that's an act of violence.

1          And we have innumerable examples in the

2    materials you collected of exactly that:  Anal, oral,

3    vaginal rapes of boys, girls, dogs.  There's bestiality

4    here.  There's torture here.  There is every description

5    of the exploitation of children to the extent that I would

6    be able to imagine it.  The torture videos are

7    particularly horrific.

8          And, it is true that viewing still images is one

9    thing.  Viewing the extensive number of video surveillance

10   you collected and hearing these children scream, helpless,

11   oftentimes bound by the adult, tied with ropes, beaten,

12   defecated upon, urinated upon, penetrated, completely

13   helpless.  If you think your experience back on a school

14   bus when you were in second grade, another student ground

15   herself against you and that that was a life-altering

16   sexual experience leading to deviancy, reflect upon what

17   these children have gone through.

18         There are some images of prepubescent children

19   involved here; that is, they're not infants, they're not

20   toddlers, they're older kids.  But I didn't see anybody

21   who was mid-teens or older but still underage.  It really

22   was a focus on very young, completely helpless boys and

23   girls being exploited.  And the connection, of course, in

24   your particular case, was not just possessing them to

25   trade.  These were the subjects of, you know, 20 years of

1    sexual satisfaction on your part.

2        I say that because that feeds into the

3    psychosexual evaluation nature of this form of behavior.

4    Are there treatments, are there programs to deal with this

5    kind of psychiatric or psychological construct that you

6    possess, Mr. Moreno? Yes. Yes, there are programs.

7    There are even programs in the Bureau of Prisons system if

8    you choose to seek them out or you're ordered into them.

9        So it isn't a matter of giving up on you because

10    of your crime. It isn't a matter for my consideration to

11    determine whether you are a good or a bad person. Being a

12    bad person is not a crime. I don't have any belief, based

13    on everything I've read from your community and family,

14    that you're a bad person in the sense that most people

15    would understand that. But you have very deep-seated

16    criminal thinking which has gone on for a very extended

17    period of years, the outcome of which is the massive

18    exploitation of helpless children in the ways to which

19    I've referred.

20        I don't know how you dealt with the screams and

21    the crying in those videos. But I think for most people

22    to clearly understand what you were looking at and

23    trading, it can only be understood by seeing the image

24    view.

25        Now, the whole matter of having big downloads

1    with the internet as it is now and having images show up

2    that are not of particular interest to you, I do think

3    after our discussion with Mr. Andrews that really you were

4    in the position and willingly did compile these things for

5    purposes of trading them to acquire images in which you

6    did have an interest, I don't know whether you had an

7    interest in every type of image that's part of this case.

8    But you know the trading of those images, compiling them

9    to trade, that's what feeds this form of behavior.  And as

10   child pornography has progressed over the years, images

11   have become increasingly violent.  And the images of

12   torture of children seem to be increasingly prevalent as

13   well.

14        So you really had a hand in expanding the

15   audience of people who view these things by trading and

16   creating additional desire for more images.  It seems to

17   be an insatiable form of human behavior once a person goes

18   down that road, which you clearly accept that you did.

19        You know, we have innumerable drug conspiracy

20   cases in this court -- methamphetamine, heroin, fentanyl,

21   you name it -- and they're always called victimless crimes

22   because we don't know -- in law enforcement and as judges

23   we don't know what effect it's had.  In the massive

24   quantities of methamphetamine that flow through this city

25   every week, we don't know the names of the people damaged.

1    Well, that's not true here in this crime type.

2            Because of the national effort to try to

3    identify victims and Congress's effort to provide

4    restitution to identifiable victims of childhood sexual

5    exploitation, we do know their names, and they are on a

6    list that Ms. Collins filed.

7            Now, restitution is an important and required

8    part of sentencing in this case type.  I need to look at

9    the restitution statutes, and I need to hear from

10   Mr. Andrews and Ms. Collins about the basis for their

11   structuring the amounts requested for restitution.

12   Restitution is mandatory, so I'll defer for 90 days the

13   judgment with regard to the amount of restitution you're

14   going to pay as part of your sentence.  And I would

15   anticipate at this point that we'll set a date for a

16   hearing where these issues can be thoroughly discussed.

17   You will not be present for that hearing, but Mr. Andrews

18   will be communicating with you about that so that he's

19   fully prepared to express your position.

20           If the parties reach an agreement on

21   restitution, please advise me of that as soon as that's

22   accomplished, and the hearing won't be necessary.  And

23   I'll enter an amended judgment with the restitution figure

24   in it and the persons to whom restitution is to be paid.

25           So we know what the federal sentencing guideline

range is.  We started this hearing by my putting it on the
record.  It is 210 months to 240 months in federal prison;
20 years at the top end, the statutory maximum.

Ms. Collins is correct in pointing out I have a
policy disagreement with the United States Sentencing
Commission on paragraph 25 of this presentence report.  I
believe through discussion with other judges that there
are very few federal judges in our circuit, in our part of
the United States in federal court, who still add two
levels to a guideline calculation for the use of a
computer.  The use of a computer is the interstate
connection.  It's the jurisdictional element.  And the
offense charged under the federal statute can't be
committed without the use of an interactive internet
capable device -- a computer, an iPhone, and the like.

And so I will, as I've done, and I must be
consistent in this, I will put in place a downward
variance of two levels to remove the use of a computer and
its two-level increase in your guideline calculation.
That would make the total offense level not 37, it would
make it 35.  Criminal history Category I, that makes the
guideline range as I determine it 168 months to 210 months
in federal prison.

As Ms. Collins said, that guideline range is 14
years to 17 and a half years in federal custody.

1          I would note that the top end of the
2   recalculated guideline range of 17 and a half years is the
3   same as the bottom of the guideline range without any
4   two-level downward variance, 17 and a half years.
5          So I do make that judgment here.
6          Mr. Andrews, you've labored mightily on behalf
7   of Mr. Moreno, and you've done more than sufficient work
8   as defense counsel and effective work.
9          I am going to deny your motion for downward
10  variance.  I don't disrespect the reasons you've put
11  forward, but I view this case somewhat differently for the
12  reasons I've stated so far.
13         So we know what the guideline range is, as I've
14  recalculated it.  Then we must turn to the basis for your
15  motion for downward variance.  18 United States Code
16  Section 3553(a) is Congress's direction in a statute to
17  fashion and impose enough of a sentence but not a sentence
18  greater than necessary to accomplish the purposes of
19  federal sentencing.
20         Each of those purposes is identified in the
21  statute by Congress.  And, properly handled, a judge is to
22  balance each of those factors in each case.  In other
23  words, that is the way that a sentence can be constructed
24  to make the sentence not only fit the crime committed, but
25  the individual committing it and the needs of the

1    community.

2              So the factors are as follows:

3              I have to consider the seriousness of the

4    offense;

5              The need for punishment, which Congress says in

6    another law is prison.  Prison is not rehabilitation,

7    thorough there are programs you may choose to seek out.

8    Prison is punishment in the federal system.

9              I must consider the manner in which the offense

10   was committed;

11             I have to consider your personal history and

12   characteristics;

13             Congress says I have to have a sentence that

14   sports respect for the law and deters you and others from

15   future criminal conduct of this nature.  Congress expects

16   sentences to send a message to the larger community that

17   there are serious consequences for serious criminal

18   behavior.

19             Congress also expects the sentence to protect

20   the community from future crimes from you in this

21   individual case.

22             I do have to consider the federal sentencing

23   guidelines, and I certainly do.  I'm not bound to follow

24   them, but I certainly consider them.

25             And I have to consider your needs for

1    rehabilitation and treatment.

2           So in balancing toes factors, the needs for

3    rehabilitation and treatment are real.  It's important.

4    You're 41 years old.  No matter what the sentence in this

5    case, even if it's 20 years, you're going to be out of

6    custody and back in community and family.

7           At that point, my view is as far as the Court

8    can be involved, that's the period of rehabilitation and

9    treatment, supervised release in the federal system.  We

10   have no parole in the federal system.  Supervised release

11   is designed for two very important reasons:  First is to

12   protect the community from future criminal conduct on the

13   part of the person being sentenced; and secondly, to

14   address the rehabilitation needs of the individual.

15   Because, treatment and rehabilitation and success at that

16   also protects the community, because a person is less

17   likely to commit crimes.

18          Absenting a person from the community for a

19   period of time through incarceration, of course, is

20   community protection, but so is the reality of

21   rehabilitation and treatment.  And I will set the terms of

22   your special conditions of your supervised release today

23   as part of sentencing.

24          Now, when you come out of custody, your needs

25   will be reevaluated so that there can be a current

1    determination as to what rehabilitation and treatment

2    needs and what community protection needs should be part

3    of supervised release.  So I'll set a very basic series of

4    special conditions for you today.

5            Now, balancing those factors, the serious of the

6    offense, I'm sure you can understand from what I've said,

7    this is among the most serious child pornography offenses

8    I have seen.  It is difficult, and just in terms of images

9    of imagining more serious exploitation of children

10   sexually and with violence and in your conduct here.  It's

11   extraordinarily serious.

12           The need for punishment is real, and a custody

13   sentence, of course, is required.

14           Respect for the law and deterrence of future

15   criminal behavior on your part is addressed by a prison

16   sentence followed by rehabilitation and treatment.

17           Your personal history and characteristics;

18   you're not the first individual in a case of this type who

19   has held a position of real responsibility in the

20   community.  In fact, child pornography cases run the

21   entire gamut of age of people who engage in this criminal

22   behavior, their station in life, their income, their

23   family support or lack of it.  There are no boundaries

24   with regard to the people who become involved in this

25   criminal behavior.

1          I recently sentenced in a child pornography case

2     the head of the Veterans of Foreign Wars in this

3     community, and there are others who are high-ranking

4     people in the community, either by wealth or position,

5     that have had the same experience with regard to

6     committing this criminal offense, and they've been

7     sentenced.

8          So it isn't a matter of, you know, determining

9     whether you're a good or bad person.  I am sure the people

10    who have experienced the side of you that is caring,

11    loving, endlessly giving, supportive of others, engaged in

12    helping those in need, I have no doubt about that.  It is,

13    in a case like this, as though there are two persons

14    present in the court; one that's understood by your family

15    and community, and the other which is understood through

16    the investigation of the criminal behavior in which you've

17    engaged.  And so I can only deal with that side which is

18    criminal in nature, bearing in mind that you have a very

19    strong support system, you have a very strong faith, and

20    you have, you know, really access to the sources of

21    strength you need to go forward in life in a decent way.

22    And I would expect that would include your time in

23    custody.  So I don't disregard that.

24         Dealing with the crime, as I've said, is the

25    other major matter that we must bring to conclusion here.

1        This is a case where a message has to be sent to

2    the larger community, as Congress directs.  It is true

3    that a person in a position of authority bears a special

4    responsibility as a role model in the community; and for

5    you as a leader in communities of faith and in the

6    incredibly important charitable work for the Salvation

7    Army, that you are an example of someone who is engaged in

8    this behavior, and people will watch.  They will know.

9    They will watch the sentence.  And the message has to be

10   sent that without regard to who you are, your station in

11   life, or your accomplishments, this kind of criminal

12   behavior involving these sexual exploitation of children

13   must come to an end, and the message has to be sent.

14        Deterring you from future criminal behavior so

15   as to protect the community, I think it's highly likely in

16   your case that the time will come with appropriate therapy

17   and treatment that you will not be a danger to the larger

18   community.

19        Now, don't misunderstand me; we've had any

20   number of cases where people are sentenced for this

21   offense, and they're back.  They commit this offense type

22   again.  I'm not saying that's the case with you, but it's

23   not outside the experience of people who work in this area

24   or of this Court that people do relapse or go back to this

25   form of criminal behavior.  It does happen.

1          But I believe in your case, eventually there

2     will be an opportunity for rehabilitation and treatment

3     and community protection through supervision.

4          So that's the needs for rehabilitation and

5     treatment, which I consider an important factor; but it

6     comes later in the case, after the requirement for

7     punishment.

8          The federal sentencing guidelines, I've spoken

9     to those.  My view is in balancing these 3553(a) factors

10    carefully, having spent a great many hours on this case,

11    as did Ms. Collins and Mr. Andrews, I believe the sentence

12    that I can fashion after hearing from everyone, whether I

13    do it under 3553(a) or I do it under the federal

14    sentencing guidelines, the custody term would be the same,

15    under either system, a fair and just sentence in this

16    case.

17         I do think eight years of supervised release is

18    important, to make certain that you get the resources and

19    support you need and to make sure the community is

20    protected.

21         My considered judgment now, having studied this

22    matter and having heard from everyone, is that a sentence

23    of 210 months, which is 17 and a half years in federal

24    prison, that is a fair and appropriate punishment.  I have

25    to make certain that your sentence is not too lenient or

1    too severe compared to others engaged in similar conduct.

2    That's what the guidelines tried to accomplish.

3            And here, I do think my revised guideline range

4    at the high end, 210 months, that's an appropriate

5    guideline reality given how the guidelines have accounted

6    for the aggravating factors and the acceptance of

7    responsibility that you have clearly shown.

8            If I balance the 3553(a) factors, I'd reach

9    exactly the same conclusion with regard to punishment.

10            There is no joy in sentencing in this case.

11    There's only tragedy, and the tragedy that few can really

12    understand.  I do my best, but I know there are limits

13    here.  The tragedy is these children.  And if you read the

14    victim impact letters, a lifetime of damage which has been

15    done to these kids:  Unable to form relationships, unable

16    to have any form of normal sexuality, unable to interact

17    with the opposite sex, male or female, in any normal way.

18    Really twisted lives, and all too often suicide.  These

19    things are not something that can be set aside.  They are

20    real, and they are certainly a consideration for me in

21    sentencing.

22            So if you would please stand, Mr. Moreno, I will

23    announce your sentence.

24            Based on the Constitutional and statutory

25    authority vested in this Court, it is the judgment of the

1  Court that Javier Clark Moreno is hereby committed to the

2  custody of the United States Bureau of Prisons to be

3  incarcerated for a term of 210 months, which is 17 and a

4  half years in federal prison.

5          Upon release from imprisonment, Mr. Moreno, you

6  are placed on supervised release for a period of eight

7  years.  Within 72 hours of your release from the custody

8  of the Bureau of Prisons you must report in person to the

9  U.S. Probation office in the district to which you are

10 released.  That's how you start your supervised release

11 term.

12         There are mandatory conditions of supervised

13 release in federal law which must be followed.  First, you

14 must not commit another federal, state, or local offense

15 while you're on federal supervision.

16         Of course, you cannot illegally possess a

17 controlled substance.  There's a mandatory drug testing

18 requirement in federal law, but I'm suspending that

19 because I believe given your history you're a low risk for

20 the future abuse of controlled substances.

21         Every federal felony sentencing requires you to

22 cooperate in the collection of DNA, and that's imposed

23 here.

24         And you must comply with these requirements of

25 the Sex Offender Registration and Notification Act.  That

1    is a federal statute, the violation of which is a felony,

2    regularly prosecuted all over the United States.  You will

3    need to learn registration requirements.  And any state in

4    which you reside, the individual states have their own

5    registration requirements.  But the Sex Offender

6    Registration and Notification Act is the federal statute;

7    which, if you fail to register, it will bring a felony

8    charge.  So I'm sure you will make certain you're

9    registered.

10           Now, the standard conditions of supervised

11   release will be in your judgment in writing.  You'll see

12   those.  The standard conditions were adopted by the

13   federal judges in South Dakota.  They apply in all

14   supervised release cases.  Your supervising officer will

15   explain those standard conditions to you when you are

16   coming out of custody, so you understand them.

17           And at this point there are only five special

18   conditions of supervision which really apply at this

19   point, knowing what we do.  As I said, these will be

20   reevaluated when you're coming out of custody.

21           First, you must not initiate, establish, or

22   maintain contact with any male or female child under the

23   age of 18 nor attempt to do so except under circumstances

24   approved in advance and in writing by the U.S. Probation

25   office.  We do not know where your psychological or

1    psychiatric or behavioral issues lie, because there's been

2    no therapy or treatment.  And so the protection of

3    children is necessary on the possibility of a future

4    contact offense.

5            Secondly, you must participate in the probation

6    office's computer internet use and monitoring program and

7    comply with the provisions of the participation agreement

8    used in the District of South Dakota.  Participation in

9    this program is in lieu of having all access to a computer

10   denied.  As part of the program, you must consent at the

11   direction of the probation office to having installed on

12   your computers at your expense any hardware or software

13   systems to monitor computer use or prevent access to

14   particular materials.

15           Third, you must undergo inpatient or outpatient

16   psychiatric or psychological treatment as directed by the

17   probation office and take any prescription medications

18   considered necessary by your mental health treatment

19   provider.

20           Fourth, you must submit your person, your

21   residence, your place of business, your vehicle, your

22   possessions, any computer, smart phone, tablet, or other

23   internet-capable device to search conducted by a United

24   States Probation officer who is searching without a

25   warrant when that officer has a reasonable suspicion that

1    you have violated a condition of your supervised release.

2    And that search provision includes passwords for those

3    internet-capable devices.

4            Fifth, you must participate in sex offender

5    treatment and submit to polygraph examinations as directed

6    by the probation office.

7            Now, I'm going to defer for 90 days the

8    mandatory restitution that will be imposed in this cases,

9    after I further consider the position of the parties, and

10   the amended judgment will be entered accordingly.

11           You don't have the ability to pay a fine, given

12   the likely restitution amounts, Mr. Moreno, so I will

13   waive a fine in your case.

14           I'm required, as is true with every federal

15   felony sentencing, to impose a special assessment of $100.

16   The money is due immediately.  It goes into a National

17   Crime Victims Assistance Fund, which is why it's mandatory

18   in every federal sentencing.  You know, if you can't pay

19   it, I will waive the interest requirement on it and you

20   can pay it over the course of your judgment.

21           There would be, under the Justice of Victims for

22   Trafficking Act of 2015, a separate $5,000 special

23   assessment.  But, Congress determined in that law that if

24   you're an indigent person, that that $5,000 assessment

25   does not apply.  And according to paragraph 70 of the

1    presentence report, you are indigent at this point, and

2    that special assessment will not be imposed.

3         You shall forfeit your interest to the following

4    property -- in the following property to the United

5    States.  These are all devices that were used in

6    connection of your committing the offense.  There are 33

7    individual devices and pieces of property named that are

8    connected to this offense.  So what I'm going to do in the

9    judgment is refer to paragraph (L) of the plea agreement,

10   which sets out all of the devices to be forfeited.  Those

11   will become part of your judgment.  And I do order those

12   33 items forfeited to the United States.

13        You may be seated, Mr. Moreno.

14        Ms. Collins, is there any legal reason why the

15   sentence should not be imposed as announced?

16        MS. COLLINS:  No, Your Honor.

17        THE COURT:  Do you wish to preserve your

18   position with regard to sentencing, Mr. Andrews?

19        MR. ANDREWS:  That's correct, Your Honor.

20        THE COURT:  Yes, I won't ask you to agree with

21   this sentence.  You've made your advocacy effective and

22   clear.

23        Any need for clarification, Ms. Rhodes?

24        PROBATION OFFICER:  No, Your Honor.

25        THE COURT:  Well, I do impose the sentence as I

1   have announced it, Mr. Moreno.

2           With federal plea agreements it's standard to

3   give up most of your appeal rights.  But if you wanted to

4   challenge this sentence in the United States Court of

5   Appeals, the law requires me to tell you you have only

6   14 days from today's date within which to appeal.  If you

7   wish to appeal, tell Mr. Andrews, and he will file the

8   papers to protect your appeal rights.

9           Do you understand you have only 14 days within

10  which to appeal?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Is there a motion to dismiss count

13  two of the indictment?

14          MS. COLLINS:  Yes, Your Honor.

15          THE COURT:  Yes.  And that's part of the

16  arrangement you had with the U.S. Attorney's Office.  I'm

17  dismissing the second felony charge brought against you in

18  this case, Mr. Moreno.  That's dismissed now.  You're free

19  of it.

20          I do want to note that members of the Internet

21  Crimes Against Children Task Force, the ICAC members

22  sitting behind Ms. Collins, are the ones who brought you

23  to justice and tried to protect children as best they

24  could in this case.  They do that every day for kids in

25  this state and in this nation.  It's a joint federal/state

1    endeavor.  It's extremely important.  I can't express

2    clearly enough that there are real children involved in

3    real cases of solicitation and sexual abuse of kids.  And

4    these law enforcement officers are dedicated to stopping

5    it, as well as their mission to put an end to your access

6    to and use of sexually exploitative materials of children,

7    which is your crime here, sir.  So I appreciated the work

8    of the ICAC force deeply.

9              Court is adjourned.

10             THE LAW CLERK:  All rise, please.

11             (End of proceedings this date at 3:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       COURT REPORTER'S CERTIFICATE

3
UNITED STATES DISTRICT COURT   )
4   DISTRICT OF SOUTH DAKOTA      )      SS
WESTERN DIVISION               )
5

6              I, Sheri L. Not Help Him, RPR, CRR, Official

7   Court Reporter in and for the United States District

8   Court, District of South Dakota,

9              DO HEREBY CERTIFY that I acted as such Court

10  Reporter at the Sentencing Hearing of the within-entitled

11  action, and that the foregoing public transcript, pages 1

12  to 73, inclusive, is a true and complete transcript of my

13  stenographic notes taken at said Sentencing Hearing on

14  August 16, 2022.

15             Dated at Rapid City, South Dakota, this 20th day

16  of October, 2022.

17             */s/ Sheri L. Not Help Him*
               _____
18             SHERI L. NOT HELP HIM
               Official Court Reporter
19             515 Ninth Street #302
               Rapid City, SD  57701
20             Phone:  (605) 399-6007
               Email: Sheri_nothelphim@sdd.uscourts.gov
21

22

23

24

25